# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| **BARNEY DONALSON JR.,** | § | |
| | § | |
| **Plaintiff,** | § | **CIVIL ACTION NO.  6:22-CV-00013-JDK** |
| | § | |
| | § | |
| **v.** | § | |
| | § | |
| **ERIN MCLEAISH,** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

## REPORT AND RECOMMENDATION OF
## UNITED STATES MAGISTRATE JUDGE

Before the court is Defendant Erin McLeaish's ("Defendant") motion for summary judgment. (Doc. No. 18.) Plaintiff Barney Donalson ("Plaintiff") has filed a response (Doc. No. 21), to which Defendant has filed a reply (Doc. No. 24). For the reasons stated herein, the court **RECOMMENDS** that Defendant's motion for summary judgment (Doc. No. 18) be **GRANTED**.

## BACKGROUND

Plaintiff filed the instant action on January 14, 2022, alleging violations of 42 U.S.C. § 1983 against Defendants Erin McLeaish and Steve Deville. (Doc. No. 1.) Since that time, the claims against Defendant Deville were voluntarily dismissed pursuant to Rule 41(a)(1)(A)(i). (Doc. No. 11.) Therefore, the only remaining claims in this action are the claims asserted against Defendant McLeaish.

### I.    Plaintiff's Complaint

Specifically, Plaintiff alleges violations of the Fourth and Fourteenth Amendments against Defendant McLeaish for unlawful detention and excessive use of force. *Id.* at 7–9. Plaintiff alleges

1

that he is an ordained Mennonite minister who was working on church projects, which included the purchase of a nursing home in Canton, Texas. *Id.* at ¶¶ 6, 7. Plaintiff alleges that he was subjected to ongoing harassment and the property was burglarized and subjected to overt acts. *Id.* at ¶ 8. Plaintiff alleges that in 2019 the church was involved in litigation with the City of Canton and that in January 2020, he received a phone call from an unknown individual stating that a judge had signed an order ordering his church closed. *Id.* at ¶¶ 9, 10. Plaintiff claims that he personally went to the Van Zandt County courthouse to file an appeal and request a stay when he encountered Defendant McLeaish, a bailiff at the county courthouse, who ordered him to "sit in a specific chair at the end of a hallway." *Id.* at ¶ 12. Plaintiff claims that Defendant McLeaish told him the judge was on vacation and that he accused her of lying, after which she ordered him to be quiet and stood over him in a "threatening and provoking manner." *Id.* at ¶ 13. Plaintiff alleges that he got out his phone to photograph what was happening when Defendant McLeaish "flinched in an aggressive and intimidating manner" and therefore he began striking himself in the head with his phone. *Id.* at ¶ 14. Plaintiff alleges that Defendant McLeaish thereafter assaulted Plaintiff by slamming him into the floor and placing him in handcuffs and that she put her knee on the center of his back and twisted her knee into his back with the full force of her weight in order to inflict injury on Plaintiff. *Id.* at ¶¶ 18, 19.

Plaintiff was taken to Terrell State Hospital for evaluation and was discharged. *Id.* at 21. Plaintiff alleges that Defendant McLeaish's actions caused him internal injuries "resulting [i]n ongoing pain, several falls, and required use of a wheelchair and walker to get around." *Id.* at ¶ 23. Plaintiff alleges that he continues to experience excruciating back pain and limits on his mobility. *Id.* Based on these facts, Plaintiff asserts two causes of action against Defendant McLeaish for

unlawful detention and excessive use of force. *Id*. at ¶¶ 24–30. Plaintiff seeks both compensatory and punitive damages. *Id.* at ¶¶ 35–40.

## II.    Defendant's Answer

Defendant McLeaish filed an answer on March 1, 2022, admitting that Plaintiff was in the Van Zandt County courthouse on January 14, 2020, that he approached the court coordinator, and that Defendant was a courthouse deputy on that date. (Doc. No. 5, at ¶ 12.) Defendant further admits that she told Plaintiff the judge was not in the courthouse, that Plaintiff needed to keep his voice down because court was in session, and that she stopped Plaintiff from injuring himself by placing him in handcuffs. *Id.* at ¶ 13. Defendant admits that Plaintiff hit himself in the head multiple times with his cellular telephone and that he hit his head on the wall multiple times, and that he was told to lower his voice and take a seat in the hallway. *Id.* at ¶¶ 14, 15. Defendant admits Plaintiff was placed in handcuffs for his own protection after he hit himself in the head with his cellular telephone and that she placed her knee on Plaintiff's back while she was attempting to keep Plaintiff from continuing to harm himself and get him handcuffed. *Id.* at ¶¶ 18, 19. Defendant admits she was acting under color of state law. *Id.* at ¶ 22. Defendant denies that she caused Plaintiff any injuries, denies liability, and denies all other factual allegations. (Doc. No. 5.) Defendant raises the affirmative defense of qualified immunity, and asserts that injuries sustained by Plaintiff, if any, were solely caused by Plaintiff's own actions. *Id.* at 7.

## III.    Defendant's Summary Judgment Evidence

In support of her motion for summary judgment, Defendant submits the temporary restraining order issued against Defendant and the church by the Van Zandt County judge (Doc. No. 18-1), Defendant's affidavit and accompanying exhibits (Doc. No. 18-2), and the affidavit of Waynette Barker (Doc. No. 18-3).

### a. Temporary Restraining Order ("TRO")

The attached TRO, which is referenced in the complaint, issued on January 14, 2020, by a presiding judge of Van Zandt County. (Doc. No. 18-1, at 1.) The TRO states that property purchased by Plaintiff and the church is in violation of several city ordinances, that it is not zoned for residential occupancy, that it has no certificate of occupancy, that it lacks electrical systems up to code, and that it contains numerous serious health and safety code violations. *Id*. at 2. As a result, the TRO enjoins Plaintiff, the church, and its employees and servants from occupying the residence and orders the remediation of the city ordinances and health and safety violations. *Id*. at 3. The TRO further includes various other requirements for entrance and work on the property, authorization for authorities to enter the property, disconnection of water service to the property, and third-party inspections. *Id.* at 4–5.

### b. Affidavit of Erin McLeaish

Defendant's affidavit provides that she was working at the Van Zandt County courthouse on January 14, 2020, as a bailiff when she heard Plaintiff's voice from down the hallway, which sounded loud and agitated. (Doc. No. 18-2, at 1.) Defendant states that at this time she was not yet aware that the courthouse coordinator had messaged her asking for assistance with Plaintiff. *Id*. at 1–2. Defendant states that she had a conversation with Plaintiff that was captured by her body camera video and that she left Plaintiff sitting in a chair down the hallway. *Id*. at 2. Defendant states that while she and Deputy Rule were speaking with Plaintiff, he began striking himself in the head with his cellular phone and striking the back of his head against the wall screaming. *Id.* Defendant states that she and Deputy Rule attempted to take hold of Plaintiff's hands to keep him from continuing to hit himself with his phone, and that Plaintiff and Deputy Rule ended up on the floor. *Id.* Defendant states that Plaintiff had caused himself to bleed and that she, with the help of

other officers, eventually got him handcuffed. *Id.* Defendant states that a civilian employee pressed the panic alarm as a result of the incident, that emergency medical services arrived, and that Plaintiff refused medical transport but allowed them to bandage his wounds. *Id.* Defendant states that Plaintiff was eventually transported to Terrell State Hospital for a mental evaluation and once released taken to Van Zandt County Jail under the charge of Hindering Proceedings and Disorderly Conduct. *Id.* Defendant includes a supplemental narrative that details many of the same facts asserted in her affidavit (Doc. No. 18-2, at 4–5), the affidavit of probable cause for Plaintiff's arrest for Hindering Proceedings by Disorderly Conduct (Doc. No. 18-2, at 6–7), her body camera video, and a video from the Van Zandt County courthouse. Further discussion of the video footage will be contained in the analysis section of this report and recommendation.

### c.   Affidavit of Waynette Barker

Defendant submits an affidavit of Waynette Barker who states that she is the District Court Administrator for the 294th District Court of Van Zandt County. (Doc. No. 18-3, at 1.) Ms. Barker states that on the morning of January 14, 2020, Plaintiff entered her office and asked to see District Judge Chris Martin. *Id.* Ms. Barker states that she attempted to inform Plaintiff that the judge was not in the courthouse that day, and that Plaintiff yelled at her saying "I thought this is what you wanted me to do." *Id.* Ms. Barker states that she told Plaintiff she would present his motion to the visiting judge, Judge Banner, who was in the courthouse, but that Plaintiff would not listen to her. *Id.* Ms. Barker states that she was alarmed by the way Plaintiff acted in her office and so she sent a message to courthouse deputies Erin McLeaish and Debbie Rule asking for assistance. *Id.* at 2.

### IV.   Plaintiff's Summary Judgment Evidence

In response to summary judgment, Plaintiff submits his own declaration, and attached exhibits, including pictures of the vandalized property, an email regarding the restraining order,

photographs of Defendant McLeaish and others, prior allegations of excessive use of force in Van Zandt County, photographs from the incident at the courthouse, a statement from a church member, after visit summaries of treatment from January 17, 2020, August 4, 2020, and April 2021, and an email to counsel in this case. (Doc. Nos. 21-1, 21-2, 21-3).

### a.  Plaintiff's Declaration and Attachments

In his declaration, Plaintiff provides that he is an ordained Mennonite minister who was working with the church to manage several homeless shelters. (Doc. No. 21-1, at 1.) Plaintiff states that in 2017 he was contracted to oversee renovations and preparations of a facility in Canton, Texas that was a former nursing home. *Id.* Plaintiff states that the facility was vandalized with devil worship symbols, of which he included photographs, and that he received ominous warnings from one of Canton's wealthiest residents, Henry Lewis. *Id.* Plaintiff describes a meeting with Lewis where Plaintiff states that Lewis indicated he owned the town, that he would not support the church's presence there, and told Plaintiff to go back to Houston. *Id.* at 1–2. Plaintiff states that city officials denied an occupancy permit for the property and disconnected the electricity. *Id.* at 2. Plaintiff details the dispute with the City of Canton whereby the church continued work and worship services with energy alternative work arounds and the City refused permits or to pay for the property they condemned. *Id.* Plaintiff states that this eventually led to the City of Canton filing a lawsuit in state court seeking enforcement of ordinances against the church and its members. *Id.*

Plaintiff states that on the morning of January 14, 2020, he awoke to a missed call informing him that the judge had signed an order closing the church and threatening him to return to Houston. *Id.* at 3. After inquiring, Plaintiff states he eventually received a call back from Waynette Barker advising him that Judge Martin had signed a restraining order. *Id.* Plaintiff states that after contacting his lawyer, he wrote out a handwritten appeal and took it to the courthouse

where Ms. Barker informed him that Judge Martin was on vacation and no other judge was available. *Id.* Plaintiff disputes that he was ever told that Judge Banner was available or that he screamed at Ms. Barker. *Id.* Plaintiff states only that he raised his voice and that he was furious when he left her office. *Id.*

Plaintiff states that he was heading downstairs to see if Judge Winters was available when Defendant McLeaish appeared and told him to have a seat in a specific chair at the end of the hallway. *Id.* at 4. Plaintiff states that Defendant McLeaish made a sarcastic comment that he would sitting there all day if he was going to wait on a ruling and also states that Defendant McLeaish had prior involvement with the church and its members when she threatened to arrest them if they entered a courthouse during a protest they were conducting. *Id.* Plaintiff states that he sat in the chair as directed, but that he was aware that this chair was in a location where deputies preferred to use force because of security camera placement. *Id.* Plaintiff cites to an individual, Dustin Reynolds, who was placed in the same spot a few months earlier and who received force akin to George Floyd. *Id.*

At this point, Plaintiff states that he felt cornered and threatened and therefore turned on his phone video recorder and decided that playing crazy was the best option he had to avoid being seriously hurt by officers. *Id.* at 4. Plaintiff admits that he started yelling and hitting himself in the face with his cellphone. *Id.* Plaintiff states that Defendant McLeaish and others used force to pull him out of the chair and slam him on the floor, and that at some point Defendant McLeaish placed her knee against his lower back and lifted up, rendering the full force of her weight on his back where her knee was placed. *Id.* Plaintiff notes that Defendant Deville was also involved in the incident but states that he had no choice but to dismiss Defendant Deville because Defendant Deville managed to evade service. *Id.* at 4–5. Plaintiff notes that Defendant Deville is a ranking

member of the Masonic lodge along with other city officials and has attached pictures of proof. *Id.* at 5.

Plaintiff states that he was taken to a hospital in Athens, Texas where he refused treatment because his insurance would not cover it. *Id.* at 5. Plaintiff states he was then transferred to Terrell State Hospital for mental evaluation. *Id.* Plaintiff states that he told the doctor exactly what happened, showed her the video on his phone as well as the pictures of the vandalism, and she determined that he was not delusional or psychotic. *Id.* Plaintiff states he was then returned to Van Zandt County where he was arrested for disorderly conduct and that the church pooled resources to bond him out of jail. *Id.*

Plaintiff states that when he arrived back in Houston, he went to a hospital there and he was treated for superficial cuts on his face and that he was not aware of any internal injuries. *Id.* Over time, however, Plaintiff states that he began to experience back pain and blood in his stools and sought treatment for which he received pain killers. *Id.* Plaintiff states that he had difficulty walking and maintaining his balance and had to use a cane and wheeled walker. *Id.* Plaintiff states he was eventually hospitalized due to the rectal bleeding, which became so bad that he hemorrhaged at the hospital and required a code to revive him. *Id.* at 6. Plaintiff states that it was concluded that he had a small tear in part of his small intestine that was worsened by taking an over-the-counter NSAID. *Id.* Plaintiff states that the passing of blood continues, that he has had an intestinal infection, and constant pain and weakness in his abdomen and lower back, but no longer requires a cane to ambulate. *Id.* Plaintiff states, however, that the pain limits his daily activities, including his ability to walk and to sit or stand for long periods of time. *Id.* Plaintiff states he cannot perform many of his duties as a church minister and resides with a caretaker in Cleveland, Texas. *Id.* Plaintiff states that he does not want to be involved in litigation with

Defendant McLeaish and Van Zandt County and that he offered to dismiss the case in exchange for a simple apology. *Id.*

## LEGAL STANDARD

A motion for summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). The Supreme Court has interpreted the plain language of Rule 56 as mandating "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting *Celotex*, 477 U.S. at 323–25). A fact is material if it might affect the outcome of the suit under the governing law. *Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999). Issues of material fact are "genuine" only if they require resolution by a trier of fact and if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Merritt-Campbell, Inc.*, 164 F.3d at 961. If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Little*, 37 F.3d at 1075.

If the movant meets this burden, Rule 56 requires the opposing party to go beyond the

pleadings and to show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. *EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1180 (5th Cir. 1996); *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1046–47 (5th Cir. 1996). The nonmovant's burden may not be satisfied by argument, conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a mere scintilla of evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 585 (1986); *Wallace*, 80 F.3d at 1047; *Little*, 37 F.3d at 1075.

When ruling on a motion for summary judgment, the court is required to view all justifiable inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *Merritt-Campbell, Inc.*, 164 F.3d at 961. However, the court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *as modified*, 70 F.3d 26 (5th Cir. 1995). Unless there is sufficient evidence for a reasonable jury to return a verdict in the opposing party's favor, there is no genuine issue for trial, and summary judgment must be granted. *Celotex*, 477 U.S. at 322–23; *Anderson*, 477 U.S. at 249–51; *Texas Instruments*, 100 F.3d at 1179.

## DISCUSSION

Defendant McLeaish moves for summary judgment on the defense of qualified immunity because Defendant McLeaish argues that Plaintiff has failed to identify any action on her part that violated the constitution, and because her conduct was objectively reasonable in light of clearly established law. (Doc. No. 18.) Plaintiff contends that Defendant McLeaish is not entitled to qualified immunity because the law is clear that placing a knee on Plaintiff's back in a manner that

causes physical injury is excessive use of force and because a question of fact exists regarding whether Defendant McLeaish was acting in good faith when she intervened to stop Plaintiff from hitting himself in the head with his phone. (Doc. No. 21, at 2–3.)

## I.     Qualified Immunity

The doctrine of "qualified immunity" protects government officials from "liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 800 (1982). The qualified immunity inquiry determines whether a plaintiff has shown "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al–Kidd,* 563 U.S. 731, 735 (2011) (citing *Harlow*, 457 U.S. at 818). The court has "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

An additional consideration exists in the analysis of a qualified immunity defense on a motion for summary judgment. Once a defendant invokes qualified immunity, "the burden shifts to the plaintiff to demonstrate the inapplicability of the defense." *McCreary v. Richardson*, 738 F.3d 651, 655 (5th Cir. 2013) (internal citation omitted). Thus, although the court "draws all factual inferences in favor of the non-movant, . . . once the issue of qualified immunity is raised, the non-movant (*i.e.* the plaintiff in this case) bears the burden of rebutting the defense." *See Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 380 (5th Cir. 2005) ("[w]e do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs."); *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) ("the plaintiff bears the burden of negating qualified immunity…"). "The plaintiff can defeat summary

judgment by rebutting the qualified immunity defense as a matter of law or by raising a genuine fact dispute that is material to the issue of immunity." *Johnson v. Eggebrecht*, No. 9:14-CV-144, 2015 WL 9703791, at *4 (E.D. Tex. Dec. 28, 2015), *report and recommendation adopted*, No. 9:14-CV-144, 2016 WL 165091 (E.D. Tex. Jan. 14, 2016) (citing *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015)). "[S]ummary judgment should be denied if the plaintiff's version of the facts would permit a finding that the official is not entitled to qualified immunity." *Id.* (citing *Lytle v. Bexar Cnty.*, 560 F.3d 404, 418 (5th Cir. 2009)).

### a. Alleged Constitutional Violations

As discussed above, Plaintiff alleges that Defendant McLeaish violated the Fourth Amendment by unlawfully detaining him and subjecting him to excessive use of force. (Doc. No. 1.)

### i. Unlawful Detention

Defendant first moves for summary judgment on qualified immunity on Plaintiff's unlawful detention claim arguing that Plaintiff cannot show that Defendant McLeaish violated the Fourth Amendment by telling him he could have a seat down the hall. (Doc. No. 18, at 16.) Plaintiff does not rebut the argument of qualified immunity on his unlawful detention claim.

As an initial matter, since Plaintiff has failed to raise any evidence to rebut the defense of qualified immunity as to his unlawful detention claim, the court finds that Plaintiff has failed to meet his burden to survive summary judgment as to this claim. *See Estate of Davis*, 406 F.3d at 380 (5th Cir. 2005) ("[w]e do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs."); *Brown*, 623 F.3d at 253 (5th Cir. 2010) ("the plaintiff bears the burden of negating qualified immunity…"). However,

even considering the evidence, the court finds that Defendant McLeaish is entitled to qualified immunity on this claim.

"The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures." *Peterson v. City of Ft. Worth*, 588 F.3d 834, 844 (5th Cir. 2009). Here, Plaintiff claims that Defendant McLeaish "limited his movement by ordering him down a hallway and to sit in a chair." (Doc. No. 1, at ¶ 27.) The body camera footage from Defendant McLeaish shows her interaction with Plaintiff wherein she encounters him having voluntarily entered the courthouse looking for information regarding a recent judicial order, and she tells him that he can have a seat in the hallway and asks him to keep his voice down because they are conducting court. Exhibit B.3. Defendant McLeaish did not instruct Plaintiff not to leave the seat or the courthouse, nor did she tell him that he must remain in the seat, and Plaintiff does not provide evidence of such a detention. Rather, the footage shows that it was Plaintiff who stated that he could not leave until he got a ruling. *Id.* The additional body camera footage shows Plaintiff voluntarily sitting in a seat in the hallway and conversing with the deputies until he began striking himself in the head with his cellphone, at which point the deputies intervened. Exhibit B.4.

In sum, there is no evidence that Plaintiff was ever detained when he was asked to take a seat in the hallway, let alone that he was detained in such a way that violated the Fourth Amendment's protection against unreasonable seizures. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (holding that a Fourth Amendment seizure occurs only when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."). For this reason, the court **RECOMMENDS** that Defendant's motion for summary judgment (Doc. No. 18) be granted as to qualified immunity on Plaintiff's unlawful detention claim.

### ii.  Excessive Use of Force

Defendant McLeaish also moves for summary judgment on qualified immunity as to Plaintiff's excessive use of force claim. (Doc. No. 18.) Specifically, Defendant McLeaish argues that Plaintiff cannot show any injury caused by Defendant allegedly slamming him into the floor and that the force used was necessary under the circumstances and reasonable. *Id.* at 19–21. Defendant further argues that her conduct was objectively reasonable in light of clearly established law. *Id.* at 21–22. Plaintiff argues that Defendant McLeaish violated clearly established law when she placed her knee on his back in a manner that caused physical injury. (Doc. No. 21, at 2.) Plaintiff further argues that Defendant McLeaish had no constitutional duty to prevent Plaintiff from hitting himself in the head with his cellphone. *Id.* at 3. Lastly, Plaintiff argues that Defendant McLeaish's conduct violated her crisis intervention training and standard de-escalation procedures. *Id.*

As to excessive use of force, Plaintiff alleges that Defendant McLeaish used excessive force when she slammed Plaintiff on the floor and caused serious injury by putting her knee into the small of his back and twisting. (Doc. No. 1, at ¶ 29.) "The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures." *Peterson*, 588 F.3d at 844. "To prevail on an excessive force claim, a plaintiff must show '(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable.'" *Windham v. Harris Cnty.*, 875 F.3d 229, 242 (5th Cir. 2017) (quoting *Hamilton v. Kindred*, 845 F.3d 659, 662 (5th Cir. 2017)).

### 1.  Plaintiff's Injuries

"To state a claim for excessive use of force, the plaintiff's asserted injury must be more than de minimis." *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007). Here, the summary

judgment record shows that after the incident Plaintiff was treated for superficial lacerations to his face from where he had slammed his cellphone. (Doc. No. 18-2, at 5; Doc. No. 21-1, at 5.) Plaintiff also submits summaries of medical records for follow up care, including a visit on January 17, 2020, where Plaintiff was seen for headache and dizziness and post-concussion syndrome. (Doc. No. 21-3, at 11.)

In his declaration, Plaintiff further states that while he had minor bruising and back pain at the time of initial evaluation, as time passed, he began having more severe back pain as well as blood in his stools. (Doc. No. 21-1, at 5.) Plaintiff states that he was weak, had difficulty maintaining his balance, and was forced to use a walker and/or a cane to ambulate. *Id.* Plaintiff states he saw a chiropractor, Jeffrey Young, who ordered an MRI and did not find a spinal injury but recommended Aleve for pain. *Id.* Plaintiff states he later returned for care at a hospital in Houston and received a prescription for pain killers. *Id.* Plaintiff contends that months passed without improvement and his rectal bleeding got worse to the point where he had to be hospitalized again. *Id.* at 6. Plaintiff states that while using the hospital bathroom, he lost so much blood that he passed out and they had to call a code to revive him.  *Id.* Plaintiff states that he received a blood transfusion and clotting drugs. *Id.* Plaintiff states that the doctor eventually concluded that he had a small tear in the ileum portion of his small intestine, which may have hemorrhaged from the use of NSAIDs. *Id.* Plaintiff states that although his condition has improved somewhat presently, he is still weak, has had a subsequent intestinal infection, is limited in his daily activities, is unable to perform many of his regular duties as a church minister, and resides with a private caretaker. *Id.* In support, Plaintiff has submitted medical records that show a visit on August 4, 2020, where he was seen for back pain and leg pain related to a fall. (Doc. No. 21-3, at 20.) Plaintiff further submits

medical records from his hospitalization on April 17, 2021 that details his gastrointestinal hemorrhage. *Id.* at 36.

While the record indisputably shows that the initial injuries sustained from the incident in question were superficial facial lacerations, Plaintiff has submitted additional evidence of injuries that he contends are directly related to Defendant McLeaish putting the force of her weight into her knee and onto the lower part of Plaintiff's back while he was being restrained. (Doc. No. 21-1.) His submitted records show follow up care including the initial incident and gastrointestinal issues. (Doc. No. 21-3, at 36.) As such, Plaintiff has provided enough to raise a factual question regarding his injury being more than de minimus. Nonetheless, the first prong of the court's analysis still requires showing an injury that resulted directly and exclusively from excessive force that was clearly unreasonable. *Westfall v. Luna*, 903 F.3d 534, 547 (5th Cir. 2020).

## 2. Objective Reasonableness

To be excessive, a use of force must be objectively unreasonable. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Objective reasonableness turns on the facts and circumstances of each particular scenario and must be determined by considering the perspective of a reasonable officer acting in the moment, and not with the benefit of hindsight. *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 396–97. A few considerations that inform the need for force include: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020) (citing *Graham*, 490 U.S. at 396).

The body camera footage of Defendant McLeaish shows that Plaintiff began screaming and violently banging his cellphone into his head repeatedly. Exhibit B.4. At that point, the footage shows Defendant McLeaish reaching towards Plaintiff's left arm in an apparent effort to get him to stop hitting himself. *Id.* Unable to stop him, it appears that Deputy Rule then intervened and got Plaintiff to the ground. *Id.* Defendant McLeaish grabbed his left arm in an effort to help restrain Plaintiff's arm behind his back on his left side. *Id.* The courthouse hallway video shows that once Plaintiff was on the ground, three other officers showed up to assist. Exhibit B.5 at 10:28. At this point, the courthouse footage shows that the officers did struggle to maintain control of Plaintiff's right hand that was holding his cellphone, indicating some physical resistance. *Id.* It took the help of two additional officers to eventually get Plaintiff's right hand that was holding his cellphone behind his back. *Id.* Defendant McLeaish's affidavit further states that Plaintiff did continue to struggle on the ground. (Doc. No. 18-2, at 2.)

As there was blood present from the cellphone injuries, Defendant McLeaish put on gloves, which she pulled from her back pocket, and then secured the handcuffs and conducted a pat down of Plaintiff. *Id.* Defendant McLeaish had her knee on Plaintiff's back during this time for a total of approximately two minutes. Exhibit B.5 at 10:28:22 to 10:30:28. Once Plaintiff was securely handcuffed and had been patted down, the body camera footage shows that Defendant McLeaish stood up and no longer had her leg in contact with Plaintiff's body. Exhibit B.4. The video further shows Defendant McLeaish stating that someone had hit the panic button. *Id*. Defendant McLeaish kept her hands on Plaintiff's shoulders for a bit longer while he sat, appearing to be under control, as they waited for an ambulance. *Id.* Defendant McLeaish completely removed her hands from Plaintiff after about four minutes when Trooper Cosper showed up and Plaintiff was sitting handcuffed conversing with Trooper Cosper. *Id.*; (Doc. No. 18-2, at 5.)

17

Here, Plaintiff was not committing a crime at the time of the use of force. However, under Texas law, officers may take a mentally ill person into custody without a warrant if they believe that person poses "a substantial risk of serious harm to the person or to others unless the person is immediately restrained." TEX. HEALTH & SAFETY CODE § 573.001. In this case, Plaintiff presented an objective risk of harm to himself when he began screaming and violently hitting himself in the head with his cellphone. Plaintiff had essentially weaponized his cellphone. As Defendant McLeaish attempted to stop Plaintiff from hitting himself, he continued to flail his arms and could have therefore easily struck her or Deputy Rule with his arm or his cellphone. Moreover, Defendant McLeaish was aware that Plaintiff was agitated as she had previously encountered him insisting to see a judge, stating he wouldn't leave until he had a ruling, and she had asked him to keep his voice down. Exhibit B.3. Under the circumstances, a reasonable officer would have believed that Plaintiff was a threat to himself and possibly others when he began violently hitting himself in the face with his cellphone, such that an appropriate use of force was necessary. *See Turk v. Mangum*, No. CV H-15-1003, 2016 WL 11529683, at *4 (S.D. Tex. Sept. 30, 2016) (concluding that "in those split second and rapidly evolving circumstances," a reasonable officer could have assumed that use of a taser was a reasonable use of force to bring plaintiff into custody to prevent him from causing further harm to himself or to the officers).

Once Deputy Rule got Plaintiff on the ground, Defendant McLeaish then assisted by placing Plaintiff's left arm behind his back to handcuff Plaintiff and by placing her knee on his back. Exhibit B.5. Plaintiff was lying face down on his stomach at this point, and although there was an initial struggle to restrain Plaintiff's right arm that was holding his cell phone, once his arms were restrained it appears that Plaintiff was no longer physically resisting arrest. *Id.* It was well established that the degree of force an officer can reasonably employ is reduced when an

arrestee is not actively resisting. *Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 733 (5th Cir. 2018). From the time Plaintiff appears to stop physically resisting at approximately 10:28:45, Defendant McLeaish's knee remained on his backside for slightly less than two minutes while the handcuffs were secured, and the pat down was performed. Exhibit B.5.  Although the amount of force with which her knee was placed on Plaintiff's back cannot be precisely obtained from the evidence, the footage does not show Plaintiff complaining of pain from the placement of her leg, nor does it show him otherwise in discomfort from the placement of the leg. Plaintiff's own description describes the force as "McLeaish placed her knee against my lower back, and lifted up where all her weight was forced to her knee and my back." (Doc. No. 21-1, at 4.) Although this court reviews the summary judgment evidence in the light most favorable to the nonmoving party, greater weight is given "to the facts evident from video recordings taken at the scene." *Carnaby v. City of Houston,* 636 F.3d 183, 187 (5th Cir. 2011).

Nothing in the record indicates that Defendant McLeaish did anything other than a reasonable officer would have done under the circumstances or that her use of force was excessive. The footage shows that Defendant McLeaish used the force necessary first to attempt to get Plaintiff to stop hitting himself by grabbing his arm, and then to help restrain Plaintiff by placing his arm behind his back to prevent Plaintiff from causing further injury to himself or officers as he continued to flail his arms. Exhibit B.5; *see Craig v. Martin*, 26 F.4th 699, 705 (5th Cir. 2022) ("A use of force is reasonable if an officer uses measured and ascending actions that correspond to a suspect's escalating verbal and physical resistance.") (internal quotations omitted). The placement of Defendant McLeaish's knee on Plaintiff's back during the less than two minutes it took to put on gloves, secure the handcuffs, and conduct a pat down, was not objectively unreasonable. As discussed, nothing in the record indicates that her knee was placed on Plaintiff's back in an

aggressive manner or that it was placed for a reason other than to ensure both Plaintiff's and the officers' safety while assisting with restraining Plaintiff.

Given the uncontested facts presented, Plaintiff has failed to meet his burden to show there is a genuine issue of material fact as to the reasonableness of Defendant McLeaish's use of force. For these reasons, the court **RECOMMENDS** that Defendant's motion for summary judgment (Doc. No. 18) be granted as to qualified immunity on Plaintiff's excessive use of force claim.

Even assuming Plaintiff could show a violation of the Fourth Amendment, Defendant McLeaish is nonetheless entitled to qualified immunity under the second step of the qualified immunity analysis.

### b. Clearly Established Right

"A right is clearly established only if 'the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" *Mote v. Walthall*, 902 F.3d 500, 505 (5th Cir. 2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765 (2014)). The Supreme Court has admonished courts "not to define clearly established law at a high level of generality." *Ashcroft v. al–Kidd*, 563 U.S. at 742. The contours of the right must be established by controlling authority or a "robust consensus of persuasive authority." *Mote*, 902 F.3d at 506 (quoting *Morgan v. Swanson*, 659 F.3d 359, 382 (5th Cir.2011) (en banc)). The fundamental concept promoted by requiring particularity is "fair warning" to government officials. *Id.* "[S]pecificity is especially important in the Fourth Amendment context, where ... it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

Plaintiff rebuts qualified immunity on the grounds that Defendant McLeaish violated clearly established law by placing her knee on Plaintiff's back in a manner that caused physical injury. (Doc. No. 21, at 2.) Plaintiff further rebuts on the grounds that Defendant McLeaish violated her crisis intervention and standard police de-escalation procedures. *Id.* at 3–4. However, Plaintiff has failed to provide any controlling precedent showing that Defendant McLeaish's conduct violated a clearly established right.

Plaintiff's cited cases are distinguishable. Plaintiff cites *Gagne v. City of Galveston*, for the proposition that there is no constitutional duty to prevent suicide. (Doc. No. 21, at 3) (citing 805 F.2d 558 (5th Cir. 1986)). In that case, however, the Fifth Circuit held that a police officer was entitled to qualified immunity after he placed a prisoner into a cell without removing the prisoner's belt, which violated departmental regulations, and the prisoner hung himself. *Id.* at 559–60. As the court found the officer entitled to qualified immunity under the circumstances, the case actually supports a finding of qualified immunity. Plaintiff also cites to *James v. Bartelt,* without citation, for the suggestion that qualified immunity does not protect an officer who inflicts deadly force on a person who is only a threat to himself. (Doc. No. 21, at 3.) Plaintiff's citation appears to be to a dissent of a denial of a petition for writ of certiorari. The facts discussed in Justice Sotomayor's dissent are distinguishable by the use of deadly force by an officer, which was not present here. Lastly, Plaintiff cites *Hope v. Pelzer* without proposition. *Id.* citing 536 U.S. 730, 739 (2002). *Hope* is notably distinguishable in that it involved an Eight Amendment violation where officers handcuffed a detainee and hitched him to a post with leg irons for a 7–hour period, where he was exposed to the heat of the sun, was given water only once or twice, and deprived of bathroom breaks. *Hope*, 536 U.S. at 738. None of these decisions, or dicta, would have provided Defendant McLeaish fair notice that her particular conduct was unlawful. Defendant McLeaish's use of force

in this case was far less severe than the use of deadly force in *James* and the cruel and unusual punishment in *Hope*.

Moreover, Plaintiff's contention that Defendant McLeaish violated her crisis intervention training and standard police de-escalation procedures does not deprive Defendant McLeaish of qualified immunity. As an initial matter, Plaintiff has not shown that Defendant McLeaish had violated a department policy other than to suggest she should have contacted mental health officials who were "trained to deal with a crime victim in an emotional crisis." (Doc. No. 21, at 4.) Even to the extent such a failure was a violation of a department policy, violating a departmental regulation, on its own, is not sufficient to deprive Defendant McLeaish of qualified immunity. *See Harlow*, 457 U.S. at 801 (holding that qualified immunity shields government officials from "liability for civil damages insofar as their conduct does not violate "clearly established" ***statutory or constitutional rights*** of which a reasonable person would have known.") (emphasis added); *Rice v. ReliaStar Life Ins. Co.*, 770 F.3d 1122, 1133 (5th Cir. 2014) (holding that while an officer's failure to follow departmental policy may have made his actions more questionable, it did not deprive him of qualified immunity). Here, the record is clear that Plaintiff began quickly and violently hitting himself in the face with his cellphone, causing blood to start spreading down Plaintiff and onto the chair and floor. Failure to contact a mental health professional to intervene, to the extent it was required by department policy, was not unreasonable under the circumstances and did not violate clearly established law.

As Plaintiff has not provided controlling precedent that "squarely governs the specific facts at issue," he has failed to show that the law clearly established that Defendant McLeaish's particular conduct was unlawful at the time of the incident. *Morrow v. Meachum*, 917 F.3d 870,

876 (5th Cir. 2019). Therefore, Plaintiff cannot overcome Defendant McLeaish's qualified immunity defense and summary judgment is appropriate.

## CONCLUSION

For the reasons stated herein, the court **RECOMMENDS** that Defendant's motion for summary judgment (Doc. No. 18) be **GRANTED** on the grounds of qualified immunity and that Plaintiff's claims for unlawful detention and excessive use of force against Defendant McLeaish be dismissed with prejudice.

Within fourteen (14) days after receipt of the Magistrate Judge's report and recommendation, any party may serve and file written objections to the findings and recommendations contained in the report and recommendation. A party's failure to file written objections to the findings, conclusions and recommendations contained in this report and recommendation within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**So ORDERED and SIGNED this 1st day of September, 2022.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE